IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| Capital Senior Living, Inc., | Case No. 3:22-cv-00606-JGC |
| Plaintiff | |
| v. | **ORDER** |
| Heather Barnhiser, *et al.*, | |
| Defendants. | |

This case involves alleged breach of contract, several Ohio state law torts, and misappropriation of trade secrets under the Ohio Uniform Trade Secrets Act ("OUTSA"), O.R.C. §§ 1333.61-62. Plaintiff operates independent living and assisted living facilities. Defendants include operators of independent living and assisted living facilities, which compete with Plaintiff, along with two of the competitors' employees, former employees of Plaintiff.

Plaintiff Capital Senior Living, Inc. ("Capital Senior") asserts claims against one or more of the Defendants: Heather Barnhiser, Ellie Selders, Maumee Pointe, LLC ("Maumee Pointe"), and Meridian Senior Living, LLC ("Meridian"). The claims include breach of contract, misappropriation and threatened misappropriation of trade secrets under the OUTSA, tortious interference with business relationships, tortious interference with contractual relationships, and breach of the duty of loyalty.

Pending is Defendants' motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6). (Doc. 8). The Defendants opposed the motion (Doc. 14), and Plaintiff filed a reply (Doc. 16).

For the following reasons, I deny the motion to dismiss.

Background

1. Factual Allegations

The complaint in this case primarily arises from Barnhiser's departure from Capital Senior and subsequent employment at Maumee Pointe.

Capital Senior manages The Waterford at Levis Commons ("The Waterford"), an independent living and assisted living facility, located in Perrysburg, Ohio. (Doc. 1, pgID 2). Meridian manages Maumee Pointe, an independent living and assisted living facility located in Maumee, Ohio between five and six miles away from The Waterford. (*Id.*, pgID 2-3, 8). In November 2020, Capital Senior employed Barnhiser as an Executive Director at The Waterford. (*Id.*, pgID 5). Barnhiser's employment agreement with Capital Senior ("Barnhiser Agreement") includes four relevant provisions concerning: nondisclosure, non-solicitation, remedies, and choice-of-law. Section 5 of the Barnhiser Agreement contains a nondisclosure provision stating:

> For the purposes of this Agreement, "confidential information" of Employer shall consist of all trade secrets and other information that is proprietary in nature, confidential to Employer, and not generally known by or available to the public or to Employer's competitors. Such confidential information may include, but is not limited to, one or more of the following. . . . .The identity of and internal business information regarding Employer's clients, employees . . . residents, customers . . . information relating to Employer's . . . techniques . . . properties, and services; and Employer's operational, financial and private personnel information. All such information shall be treated as confidential by Employee both during and after the termination of Employee's employment under this Agreement. Employee shall not possess, use or disclose any confidential information at any time to any person excepted authorized personnel of Employer . . . or in the usual course of performing his or her duties and responsibilities under this Agreement or as Employer may otherwise authorize in writing.

(Doc. 1-1, pgID 22).

Section 6 of the Barnhiser Agreement contains a non-solicitation clause stating:

> Employee further agrees that for one year immediately following the termination of such employment for any reason, Employee shall not for himself or herself, or for any third party, directly or through another person acting in concert with Employee: (i) divert or attempt to divert from Employer any business of any kind in which it is or has been engaged during the 12 months immediately before such employment ended at the facility or location at which Employee was employed, including, without limitation, the solicitation of,

>interference with, or entering into any contract for, competitive business services with any of Employer's clients, residents or customers that have conducted business with Employer at any time during such 12-month period; or (ii) employ or solicit for employment any person with whom Employee came into contact and who was employed by Employer in order to compete with same, or induce any such person to leave such employment or otherwise violate any employment agreement, confidentiality, non-solicitation or noncompetition agreement with Employer.

(*Id.*, pgID 22-23).

Section 8 of the Barnhiser Agreement contains a remedies provision relating to both the nondisclosure and non-solicitation provisions. It states that the nondisclosure and non-solicitation provisions "shall continue to be binding upon Employee . . . notwithstanding termination of Employee's employment . . . for any reason." (*Id.*).

It further contains acknowledgments from the "Employee" that the nondisclosure and non-solicitation provisions are "reasonable," that any "violation" "will result in immediate and irreparable harm to Employer," and that "breach or threatened breach" will entitle the employer to "legal or equitable remedies," including an "injunction." (*Id.*). Finally, the Barnhiser Agreement specifies that Texas state law will govern the contract. (*Id.*, pgID 24).

Capital Senior expends resources and effort to develop the "confidential information" identified in the nondisclosure provision of the Barnhiser Agreement. (Doc. 1, pgID 4). The "confidential information" includes residents' contact information, details about individual residents' needs and preferences, and resident-specific pricing information. (*Id.*). In order to fulfill her duties as an Executive Director, Barnhiser had access to "confidential information." (*Id.*, pgID 4, 7). Capital Senior protected the "confidential information" by having its directors sign employment agreements with nondisclosure covenants and password-protecting electronically stored information. (*Id.*).

3

In November 2021, Barnhiser voluntarily resigned from Capital Senior to become Executive Director at Maumee Pointe, which was preparing to open. (*Id.*, pgID 8). As Executive Director, Barnhiser was to manage Maumee Pointe's day-to-day operations and oversee and approve all new hires. (*Id.*). In February 2022, Barnhiser hired Selders to be Maumee Pointe's Memory Care Director. (*Id.*, pgID 9). Capital Senior had employed Selders as its Activity Assistant from February 2021 to the end of January 2022—a time period that overlapped significantly with Barnhiser's stint at Capital Senior. (*Id.*, pgID 7). As Activity Assistant, Selders had participated in confidential meetings with members of The Waterford's management team. (*Id.*).

After giving her thirty days' notice to Capital Senior, but before her departure, Selders allegedly leaked confidential information she learned in meetings with the management team to The Waterford's lower-level staff. (*Id.*). This leak interfered with The Waterford's ability to operate efficiently. (*Id.*). Also while still employed by Capital Senior, Selders allegedly made disparaging remarks about The Waterford in front of one of its new residents and the resident's daughter. (*Id.*, pgID 8).

Barnhiser, using "confidential information" to which she had at The Waterford, allegedly solicited and hired more Capital Senior employees along with Selders. (*Id.*, pgID 9-10). For example, she allegedly recruited and hired Will Richardson, the Dietary Director for The Waterford, to take the same position at Maumee Pointe. (*Id.*, pgID 9). She then directed, encouraged, or permitted Richardson to solicit two additional employees of The Waterford through text messages. (*Id.*). Capital Senior alleges that Barnhiser personally oversaw and approved Maumee Pointe's poaching of at least seven Capital Senior employees. (*Id.*, pgID 10).

4

According to Capital Senior, residents of The Waterford enter into Resident and Service Agreements for a 12-month term, with automatic renewal for additional 12-month terms. (*Id.*, pgID 14). Plaintiffs allege Barnhiser also successfully convinced at least three residents of The Waterford or their families to terminate agreements with Capital Senior and become residents of Maumee Pointe. (*Id.*). For example, she had Selders coordinate with a current employee of The Waterford to pass her cellphone around The Waterford's dining room so that Selders could solicit residents via videoconference to move to Maumee Pointe. (*Id.*).

On January 24, 2022, Capital Senior sent a cease-and-desist letter to Barnhiser demanding that she stop soliciting Capital Senior's employees and residents pursuant to the nondisclosure and non-solicitation provisions in her Agreement. (*Id.*). Capital Senior also asked Barnhiser to share the cease-and-desist letter with Maumee Pointe. (*Id.*). On January 31, 2022, Meridian responded—noting that it had addressed Capital Senior's concerns with Barnhiser and providing assurances that it expects Meridian employees "to comply with enforceable agreements they have with former employers." (*Id.*, pgID 10-11). After this exchange, Barnhiser hired Selders to Maumee Pointe in February 2022. (*Id.*, pgID 11).

On March 30, 2022, Capital Senior sent a second cease-and-desist letter to Meridian. (*Id.*). The letter alleged that Barnhiser continued to be in violation of the nondisclosure and non-solicitation provisions of her Agreement with Capital Senior. (Doc. 1-4, pgID 32). The letter identified the individual employees and residents who had left The Waterford for Maumee Pointe.[1] (*Id.*). It also stated the following:

> The Waterford is not fully aware of how Ms. Barnhiser is unlawfully soliciting The Waterford's employees and residents but based on reports from employees who decided to stay at The Waterford, there can be no question that Ms. Barnhiser has breached her

---

[1] While Capital Senior's complaint alleges that at least seven former employees have departed for Maumee Pointe, the second cease-and-desist letter identifies eight employees. (Doc. 1-4, pgID 32).

5

>Employment Agreement with the knowledge or encouragement of Meridian Senior Living's leadership.

(*Id.*). Capital Senior alleges in its complaint that Barnhiser's solicitation of its employees and residents has continued. (*Id.*).

### 2. Procedural History

On March 4, 2022, Capital Senior filed a complaint raising the following claims: (i) breach of contract, specifically of the nondisclosure and non-solicitation provisions by Barnhiser; (ii) misappropriation of Capital Senior's trade secrets in violation of the OUTSA by Barnhiser; (iii) tortious interference with Capital Senior's business relationships by Maumee Pointe, Meridian, and Barnhiser; (iv) tortious interference with Capital Senior's contractual relationship with Barnhiser by Maumee Pointe and Meridian; and (v) breach of the duty of loyalty to Capital Senior by Selders. (Doc. 1).

### Standard of Review

To survive a motion to dismiss under Rule 12(b)(6), the complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted).

When considering a Rule 12(b)(6) motion, I must "construe the complaint in the light most favorable to the plaintiff." *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). A plaintiff, however, must provide "more than labels and conclusions, and a formulaic recitation of

the elements of a cause of action will not do." *Twombly*, *supra*, 550 U.S. at 555. I can consider exhibits attached to the complaint without converting the motion to dismiss into a motion for summary judgment, "so long as [the exhibits] are referred to in the complaint and are central to the claims contained therein." *Rondigo, L.L.C. v. Twp. of Richmond*, 641 F.3d 673, 680-81 (6th Cir. 2011); *see also* Fed. R. Civ. P. 10 ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

Discussion

Defendants contend that each cause of action should be dismissed under Fed. R. Civ. P. 12(b)(6) for failure to state a claim. (Docs. 8-9). I will address each cause of action in turn.

1. Breach of Contract

Barnhiser's Agreement with Capital Senior contains a Texas choice-of-law provision, and neither party disputes the applicability of Texas law. To establish breach of contract under Texas law, a plaintiff must show (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the defendant's breach. *See, e.g.*, *Tyler v. Citi-Residential Lending Inc.*, 812 F. Supp. 2d 784, 787 (N.D. Tex. 2011); *USAA Texas Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 501 n.21 (Tex. 2018).

Barnhiser raises two primary arguments against Capital Senior's claim of contractual breach. First, that the nondisclosure and non-solicitation provisions of Barnhiser's Agreement are unenforceable because they lack sufficient consideration on the part of the employer. Second, even if those provisions are enforceable, Capital Senior has failed to allege sufficient facts regarding Barnhiser's breach to raise a plausible claim.

a. Enforceability of the Provisions

Texas Business & Commerce Code § 15.50 governs the enforceability of "[c]ovenants that place limits on former employees' professional mobility or restrict their solicitation of the former employers' customers and employees." *Marsh USA Inc. v. Cook*, 354 S.W.3d 764, 768 (Tex. 2011). Such restrictive covenants are enforceable if they are: (a) "ancillary to or part of an otherwise enforceable agreement" and (b) "reasonable" so as to "not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee." Tex. Bus. & Com. Code Ann. § 15.50. The parties do not dispute whether the nondisclosure and non-solicitation provisions are reasonable—only whether they are part of an enforceable agreement.

There is an enforceable agreement when there is offer, acceptance, and consideration for mutual, non-illusory promises. *Marsh*, *supra*, 354 S.W.3d at 773. "At-will employment is insufficient consideration to support a non-compete covenant under Texas law." *Miner, Ltd. v. Anguiano*, 383 F. Supp. 3d 682, 696 (W.D. Tex. 2019) (citing *Hunn v. Dan Wilson Homes, Inc.*, 789 F.3d 573, 584 (5th Cir. 2015). But, Texas courts find such covenants enforceable "where an employer promises to provide an employee with confidential information and the employee promises not to disclose such confidential information." *Miner, supra*, 383 F. Supp. 3d at 696 (citing cases from the Supreme Court of Texas).

The employer's promise to provide confidential information to an employee need not be express. "When the nature of the work the employee is hired to perform requires confidential information to be provided for the work to be performed by the employee, the employer impliedly promises confidential information will be provided." *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 850-51 (Tex. 2009) (finding that employee hired as an accountant could not perform his job without access to confidential information including

8

"clients' names, billing information, and pertinent tax and financial information"); *see also Hunn*, *supra*, 789 F.3d at 585.

Even if such an implied promise on the part of the employer is illusory for lacking definiteness, it can nevertheless form the basis of a valid agreement, a unilateral contract, when the employer performs the illusory promise by actually sharing confidential information. *Fielding*, *supra*, 289 S.W.3d at 852; *see also McKissock, LLC v. Martin*, 267 F. Supp. 3d 841, 853 (W.D. Tex. 2016).

Plaintiff has met its burden to show that the nondisclosure and non-solicitation provisions in the Barnhiser Agreement are enforceable. While Capital Senior provided no express promise to provide Barnhiser confidential information in the Agreement, it has sufficiently shown that it implied such a promise based on the nature of Barnhiser's position as an Executive Director. (Doc. 1, pgID 4, 7).

As Executive Director, Barnhiser was responsible for marketing, managing, and operating The Waterford. (*Id.*). Capital Senior makes clear in its complaint that Barnhiser could not accomplish such responsibilities without access to confidential information regarding current and prospective residents, employees, and The Waterford's operations. (*Id.*). The situation is analogous to *Fielding, supra*, 289 S.W.3d at 850-51, in which the Supreme Court of Texas found that an accountant could not perform his duties for his employer, an accounting firm, without access to confidential information that included, among other things, the identities and financial information of the firm's clients.

Plaintiff has also sufficiently stated that Barnhiser received the type of confidential information that is specified in the nondisclosure provision of her Agreement. I am unconvinced by Defendants' argument that the information Capital Senior provided Barnhiser was not "truly

9

confidential." (Doc. 9, pgID 93). Capital Senior states that Executive Directors "have access" to confidential information and that it specifically "provided" confidential information, including "employee and resident lists and its operational, financial, and private personnel information" to Barnhiser. (Doc. 1, pgID 4, 7). These are examples of information that the Barnhiser Agreement expressly defines as "confidential." (Doc. 1-1, pgID 22).

Other courts have similarly found such information to be confidential. *See Redi-Mix Sols., Ltd. v. Express Chipping, Inc.,* No. 6:16-CV-298-RWS-KNM, 2016 WL 7634050, at *7 (E.D. Tex. Dec. 2, 2016) (finding that "client contact, pricing information, and [an] employee list" are examples of confidential information), *report and recommendation adopted*, No. 6:16-CV-298-RWS-KNM, 2017 WL 26083 (E.D. Tex. Jan. 3, 2017); *Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 663 (Tex. 2006) (Jefferson, J., concurring) (characterizing information regarding a company's "finances, strategies, client lists, etc." as confidential).

In any case, the Supreme Court of Texas has made clear that the enforceability of restrictive covenants should not turn on "overly technical disputes" around the "true degree of confidentiality" of information. *Sheshunoff*, *supra*, 209 S.W.3d at 655-56. Instead, the "core inquiry" for enforceability is whether the restrictive covenant is "reasonable"—a point that Defendants do not dispute. *Id.*

It is therefore clear to me that Capital Senior has met its burden of pleading that the nondisclosure and non-solicitation provisions are enforceable.

b.  Breach

Defendants contend that, even if the nondisclosure and non-solicitation provisions are enforceable, Capital Senior has not plausibly alleged Barnhiser's breach of those provisions. I disagree. The nondisclosure provision of the Barnhiser Agreement defines "confidential

information" to include, among other things, identifying and contact information for Capital Senior's employees, clients, and residents. (Doc. 1-1, pgID 22).

Barnhiser is not to "use or disclose" such information except "in the usual course of performing . . . her duties" for Capital Senior. (*Id.*). The non-solicitation provision therefore acts, in part, as an enforcement mechanism for the nondisclosure provision. For a period of one year after the termination of her employment with Capital Senior, Barnhiser cannot, among other things, solicit or contract with Capital Senior's employees or residents—which necessarily restricts her from using or disclosing the identifying and contact information for those employees and residents. (*Id.*, pgID 22-23).

Capital Senior alleges that, as Executive Director for Maumee Pointe, Barnhiser "oversaw and approved" all new hires, including "no fewer than seven [former] employees of The Waterford." (*Id.*, pgID 8-10). The second cease-and-desist letter attached to Capital Senior's complaint identifies by name eight former employees of The Waterford who left for Maumee Pointe. (Doc. 1-4, pgID 32). This allegation of breach is plausible at the very least. Plaintiff's complaint provides even further details regarding Barnhiser's recruitment of two employees, Selders and Richardson, and how the three worked in concert to poach Plaintiff's employees and residents—for example, soliciting additional employees via text messages and certain residents via videoconference. (Doc. 1, pgID 9-10). The second cease-and-desist letter also identifies by name individual residents who ultimately left The Waterford for Maumee Pointe (Doc. 1-4, pgID 32). These are factually plausible allegations and not improperly conclusory, as Defendants contend.

Therefore, I deny Defendants' Motion to Dismiss Plaintiff's breach of contract claim.

    2.   Misappropriation of Trade Secrets Under the OUTSA

To establish liability for trade secret misappropriation under the OUTSA, O.R.C. § 1333.61, a plaintiff must show: (1) the existence of a trade secret; (2) the acquisition of that trade secret through a confidential relationship; and (3) the unauthorized use of that trade secret. *Best Process Sols., Inc. v. Blue Phoenix Inashco USA, Inc.*, 569 F. Supp. 3d 702, 712 (N.D. Ohio 2021) (Barker, J.); *see also Tomaydo-Tomahhdo, LLC v. Vozary*, 82 N.E.3d 1180, 1184 (Ohio App. 8th Dist. 2017). The OUTSA defines a trade secret as:

> Information, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any *business information* or plans, financial information, *or listing of names, addresses, or telephone numbers*, that satisfies both of the following:
>
> (1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
>
> (2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

O.R.C. § 1333.61(D) (emphasis added). "[T]he determination of whether information constitutes a trade secret is a highly fact-specific inquiry." *Best Process Sols*, *supra*, 569 F. Supp. 3d at 713.

Defendants argue that Capital Senior has failed to identify with sufficient particularity the trade secrets that Barnhiser allegedly misappropriated. But, the OUTSA expressly contemplates that "business information" and the "listing of names, addresses, or telephone numbers" can be trade secrets so long as they meet the other requirements of the statute. *Id.*

Capital Senior alleges that Barnhiser, as Executive Director, had access to its confidential information, including "employee and resident lists and its operational, financial, and private personnel information." (Doc. 1, pgID 7). Capital Senior also alleges that it "devotes extensive time, money, and other resources" to develop this confidential information. (*Id.*, pgID 4). Finally, it alleges that such information "is not generally known to and not readily ascertainable" to

12

Capital Senior's competitors and that Capital Senior uses nondisclosure covenants with its employees and password protection of electronically stored information to keep it that way. (*Id.*). These allegations sufficiently identify the trade secrets that Barnhiser allegedly misappropriated.

In *Avery Dennison Corp. v. Kitsonas*, the plaintiff office labeling company alleged that the defendant, a former salesman of office products for the plaintiff, was "privy to customer lists, pricing information, sales strategies and the business philosophy" of that plaintiff. 118 F.Supp.2d 848, 854 (S.D. Ohio 2000). The court determined that these categories of information derived independent economic value—noting its limited distribution and electronic password protection. *Id.* These two factors also indicated the plaintiff's reasonable efforts to maintain the information's secrecy. *Id.* The court therefore found that the plaintiff had sufficiently identified the trade secrets to support a motion for preliminary injunction. *Id.*

Capital Senior's characterization of the trade secrets that Barnhiser allegedly misappropriated is similarly sufficient to meet the burden of stating a claim. *See Best Process Sols*, *supra*, 569 F. Supp. 3d at 714 (finding that a plaintiff can survive a motion to dismiss by putting forth "general categories of its trade secrets"); *see also, M.J. McPherson Servs., L.L.P. v. Sports Images, Inc.*, No. 5:06 CV 465, 2006 WL 2505925, at *3 (N.D. Ohio Aug. 28, 2006) (Economus, J.) (finding that a customer list "is presumptively a trade secret [which] the owner of the list takes measures to prevent its disclosure in the ordinary course of business to persons other than those selected by the owner").

Defendants also argue that Plaintiff has insufficiently alleged *how* Barnhiser received and used Capital Senior's trade secrets, elements (2) and (3) of the misappropriation claim. I disagree. The facts which Plaintiff alleges to establish the element of breach in its claim for breach of contract are likewise sufficient to establish Barnhiser's acquisition and unauthorized

13

use of Capital Senior's trade secrets. *See supra*. It is plausible that Barnhiser used Capital Senior's trade secrets, at the very least its resident and employee lists, to solicit, contract with, and/or hire its residents and employees. *See Noco Co. v. CTEK, Inc.*, No. 1:19 CV 00853 DCN, 2020 WL 821485, at *8 (N.D. Ohio Feb. 18, 2020) (Nugent, J.) (finding the plaintiff "need not show exactly how [the defendant] misappropriated the trade secrets at the pleading stage when the parties have yet to conduct discovery").

In any case, the OUTSA also provides for injunctive relief from "threatened" misappropriation of trade secrets." O.R.C. § 1333.62(A). This exists "when an employee possesses knowledge of an employer's trade secrets and begins working in a position that causes him or her to compete directly with the former employer . . . ." *Procter & Gamble Co. v. Stoneham*, 747 N.E.2d 268, 278 (Ohio App. 1st Dist. 2000). For all the reasons already discussed, I find that Capital Senior has sufficiently alleged that Barnhiser knew specific trade secrets, such as customer and employee lists. Capital Senior also alleges that Barnhiser occupied the same role as Executive Director at Maumee Pointe that she did at The Waterford. (Doc. 1, pgID 15). These facts assertions are sufficient to overcome dismissal.

Defendants point to *Hydrofarm, Inc. v. Orendorff* to argue that Plaintiff's allegations are not sufficiently detailed to support a claim for threatened misappropriation. 905 N.E.2d 658, 665 (Ohio App. 10th Dist. 2008). But, I am not convinced. At issue in *Hydrofarm* was the plaintiff's motion for preliminary injunction and whether the plaintiff had put forth enough "clear and convincing" factual evidence to show that it would suffer irreparable injury. *Id.* Capital Senior is not seeking a preliminary injunction at this time and needs only to state a plausible claim, *Iqbal*, *supra*, 556 U.S. at 678, and I find that it has met this relatively lower burden.

Therefore, I deny Defendants' Motion to Dismiss Plaintiff's claim of misappropriation of trade secrets.

### 3. Tortious Interference with Contractual Relations

To establish tortious interference with contractual relations, a plaintiff must show: (1) the existence of a valid contract; (2) the wrongdoer's knowledge of the contract; (3) the wrongdoer's intentional procurement of the contract's breach; (4) the lack of justification; and (5) damages. Only "improper interference" will establish a lack of justification, element (4) of the claim. *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 707 N.E.2d 853, 858 (Ohio 1999). When considering whether a defendant's conduct was improper, courts assess:

> (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties.

*Id.* at 178-79 (citing 4 Restatement of the Law 2d, Torts (1979) 26-27, Section 767).

As stated above, I find that the nondisclosure and non-solicitation provisions of the Barnhiser Agreement are components of a valid contract. *See supra*. Plaintiff sufficiently pleads that Meridian and Maumee Pointe had knowledge of the Barnhiser Agreement at least by January 31, 2022, when Meridian acknowledged receiving Capital Senior's first cease-and-desist letter and discussing the Barnhiser Agreement with her. (Doc. 1, pgID 10-11, 13).

Plaintiff has also sufficiently alleged Meridian and Maumee Pointe's intentional actions to procure breach of the Barnhiser Agreement. Plaintiff alleges that, despite having knowledge of the non-solicitation provision in the Barnhiser Agreement and allegations of Barnhiser's alleged breach, Meridian and/or Maumee Pointe continued to employ her as an Executive Director with

final hiring authority over all Meridian/Maumee Pointe employees, including former Capital Senior employees. (*Id.*, pgID 8, 13).

Barnhiser hired Selders and Richardson on behalf of Meridian/Maumee Pointe after its acknowledgment of the cease-and-desist letter. (*Id.*, pgID 9). Meridian/Maumee Pointe's continued employment of Barnhiser in such a capacity is sufficient to establish that they intentionally procured without justification the breach of the Barnhiser Agreement.

In *MP Total Care Servs., Inc. v. Mattimoe*, I found, in dismissing a motion for summary judgment, that the defendant's hiring of an employee to increase the defendant's business, causing the employee to breach a non-solicitation covenant with her former employer, satisfied the intentional procurement and justification elements. 648 F. Supp. 2d 956, 967-68 (N.D. Ohio 2009). I reach a similar conclusion here.

Therefore, I deny Defendants' Motion to Dismiss Plaintiff's tortious interference with contractual relations claim.

### 4. Tortious Interference with Business Relations

To establish tortious interference with business relations, a plaintiff must show: (1) the existence of a business relationship; (2) the wrongdoer's knowledge of the business relationship; (3) intentional interference causing termination of the relationship; and (4) damages. *Key Realty, Ltd. v. Hall*, 173 N.E.3d 831, 854 (Ohio App. 6th Dist. 2021).

There is no dispute that Capital Senior enters into business relationships with its residents in the form of Resident and Services Agreements with residents of The Waterford. (Doc. 1, pgID 14). Barnhiser had knowledge of such agreements as The Waterford's former Executive Director. (*Id.*, pgID 7). Meridian and Maumee Pointe do not contest that, through Barnhiser as their agent, they also had knowledge of these business relationships. (*Id.*, pgID 8).

16

Defendants contend that Plaintiff has not met its burden of specifically alleging how Barnhiser, Meridian, and Maumee Pointe intentionally interfered with Capital Senior's business relationships with the residents of The Waterford. But, Plaintiffs specifically allege that Barnhiser, in concert with Selders, arranged for a videoconference with residents of The Waterford to convince them to leave for Maumee Pointe. (*Id.*, pgID 10). Capital Senior's second cease-and-desist letter, which is attached to the complaint, identifies three of The Waterford's former residents whom Barnhiser allegedly lured to Maumee Pointe through her actions. (Doc. 1-4, pgID 32).

These facts are sufficient to show that Barnhiser, Meridian, and Maumee Pointe intentionally interfered with Capital Senior's business relationships with its residents. This situation is similar to *Mattimoe*, *supra*, where I found the plaintiff sufficiently established that a competitor and its former employee intentionally interfered with business relationships when the former employee met with and successfully recruited the plaintiff's customers. 648 F. Supp. 2d at 967-68.

Therefore, I deny Defendants' Motion to Dismiss Plaintiff's tortious interference with business relationships claim.

5.  Breach of Duty of Loyalty

An employee owes a duty to his or her employer "to act in the utmost good faith and loyalty," and Ohio law recognizes a cause of action for the breach of that duty. *Staffilino Chevrolet, Inc. v. Balk*, 813 N.E.2d 940, 951 (Ohio App. 7th Dist. 2004). Plaintiff alleges three separate acts by Selders that might constitute such a breach: (1) leak of confidential information she learned during The Waterford's management meetings to lower-level staff; (2) solicitation of

17

The Waterford's residents; and (3) disparaging remarks about The Waterford she allegedly made to a new resident in the presence of the resident's daughter. (Doc. 1, pgID 16).

I do not find the alleged leak of confidential information to be sufficient to state a plausible claim. The allegation lacks any detail regarding the nature of the confidential information that was leaked, nor how the leak interfered with "the efficient operation of [The Waterford]" as Plaintiff alleges. (*Id.*, pgID 7).

Nor do I find Selders' alleged solicitation of The Waterford's residents to be sufficient to state a claim. Based on the plain reading of the complaint, Selders' solicitation of The Waterfords' residents occurred after Barnhiser hired her on behalf of Maumee Pointe. (*Id.*, pgID 9). The duty of loyalty only applies to Selders' activities during her employment with Capital Senior. To the extent Plaintiff is alleging these activities happened during Selders' employment at The Waterford, the allegation is wholly conclusory. I therefore do not find this allegation to be sufficient to state a plausible claim.

However, an employee's disparaging remark about an employer could constitute a breach of the duty of loyalty. *See Luke's Sewing Ctrs. v. Baker*, No. 1:05-CV-00402, 2007 WL 9733715, at *8 (S.D. Ohio May 3, 2007).

Defendants contend that Selders' disparaging remarks are protected speech under Section 7 of the National Labor Relations Act ("NLRA"). 29 U.S. Code § 157. But a later decision by the National Labor Relations Board (NLRB) supersedes the decision that Defendants cite for this proposition, *Decision and Order, Chipotle Services, LLC and Pennsylvania Workers Organizing Committee*, N.L.R.B. Cases 04-CA-147314 and 04-CA-149551 (Aug. 18, 2016).

Explicitly noting the superseding of *Chipotle*, the NLRB has since opined that an employee's Section 7 protections must balance against an employer's "legitimate justifications in

18

prohibiting employees from disparaging their employer or its products to the employer's customers and the public." *Motor City Pawn Brokers Inc., the Aubrey Grp. Inc., & Aubrey Bros., LLC, A Single Emp. & Terrence Walker & Patricia Tilmon*, 369 NLRB No. 132 (July 24, 2020).

Consequently, Section 7 of the NLRA does not preclude a breach of duty of loyalty claim arising from a disparaging remark. So, I find Capital Senior's allegations of a disparaging remark made in the presence of a resident of The Waterford and her daughter could form the basis for a plausible breach of duty of loyalty claim.

Therefore, I deny Defendants' Motion to Dismiss Plaintiff's breach of the duty of loyalty claim.

### Conclusion

It is, therefore, ORDERED THAT:

Defendant's motion to dismiss (Doc. 8) be, and the same hereby is, denied.

The clerk shall forthwith schedule a Case Management Conference. Not later than one week before the conference, the parties shall submit a Report of Parties' Planning Meeting.

**So ordered.**

/s/ James G. Carr
Sr. U.S. District Judge